# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00814-CV

**Colin Williams, Appellant**

**v.**

**Employers Insurance Company of Nevada f/k/a AmCOMP Assurance, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT
### NO. D-1-GN-09-002463, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Colin Williams appeals a final summary judgment that he take nothing in a suit to recover the value of stock options that he alleged were owed to him by a former employer. We will affirm the district court's judgment.

## BACKGROUND

The material underlying facts are largely undisputed. On May 10, 1999, Williams executed a contract, titled "Employment Agreement," with AmCOMP Incorporated, a Delaware corporation engaged in the insurance industry that had its principal place of business in Florida. The parties agreed that Williams would be employed as "President, Texas Region," of AmCOMP Assurance Corporation ("AAC"), a Florida corporation that was a subsidiary of AmCOMP, Inc., during an "Employment Term" beginning on the date of execution, continuing through December 31, 1999, and thereafter renewing automatically for additional one-year periods corresponding to the

calendar year unless one of the parties gave notice of its intent not to renew or otherwise terminated the Employment Agreement.

"As compensation for the complete and satisfactory performance by [Williams] of the services to be performed by him hereunder during the Employment Term," section 4 of the Employment Agreement required that AmCOMP, Inc. "shall pay" Williams a "base salary" (paragraph (a) of section 4), "incentive compensation and bonuses" that the AmCOMP, Inc. Board of Directors might provide in its discretion (paragraph (b)), and annual "Underwriting Compensation" tied to the underwriting profits from the Texas Region (paragraph (c)). Furthermore, paragraph (d) of section 4 stated:

> [AmCOMP, Inc.] shall grant to [Williams] an option (the "Option") to purchase that number of shares of AAC common stock, $.01 par value (the "AAC Common Stock"), as equals 1% of the outstanding shares of AAC Common Stock at December 31, 1998, at a per share exercise price equal to the fair market value of a share of AAC Common Stock on the date hereof (determined with reference to appraisals by Valuation Counsellors [sic] or another independent valuation firm) at December 31, 1998 and June 30, 1999.

In addition to the "compensation" promised in section 4, section 5 of the Employment Agreement promised Williams "other benefits" during the "Employment Term." These "other benefits" included sick leave, sick pay, and disability pay; paid vacation time; reimbursement of out-of-pocket business expenses; and eligibility to participate in any medical plans and "employee fringe benefits and pension and/or profit sharing plans" that AmCOMP, Inc. provided its executives or those of AAC. Section 5's "other benefits" also included eligibility for consideration by AmCOMP, Inc.'s board of directors for awards of stock options in AmCOMP, Inc. under any "stock option plan" that might be established in the board's discretion. Thus, in contrast to the stock "Option"

2

contemplated under section 4, paragraph (d), which referred to an option to purchase stock in AAC, the AmCOMP, Inc. subsidiary for whom he was to serve as its Texas Region president, the stock options contemplated by section 5 would be in AmCOMP, Inc. itself, the parent company with whom Williams was contracting.

Williams continued to work under the Employment Agreement until he resigned effective on April 1, 2008. During Williams's Term of Employment, the AmCOMP, Inc. board of directors issued him AmCOMP, Inc. stock options as contemplated by section 5 of the Employment Agreement, and he exercised them. In contrast, neither party took any further action in regard to the AAC stock "Option" addressed in section 4, paragraph (d). AmCOMP, Inc. did not, for example, take further action purporting to grant, confirm a grant, or to set the price or number of AAC shares Williams would have the option to purchase, and Williams did not demand such action or otherwise attempt to exercise any option in AAC stock.

Williams's initial attempt to invoke rights under section 4, paragraph (d), came in May 2009, shortly after the one-year anniversary of his resignation. By now, AmCOMP, Inc. had been acquired by and merged into appellee, Employers Group, Inc. (Employers).[1] On May 19, 2009, Williams wrote Employers,[2] the successor to AmCOMP, Inc., advising that upon "final review of my Employment Agreement," he had "determined that [he had] never received" the "compensation" provided in section 4, paragraph (d), of the Employment Agreement. "Now that the Company has

---

[1] Although the caption of the district court's judgment and the notice of appeal refers incorrectly to one of Employers's subsidiaries, Employers was the sole defendant named in the live petition, and it has answered and appeared as the real party in interest.

[2] To be precise, Williams addressed the letter to the president of an Employers affiliate, but it was subsequently routed to Employers's general counsel.

3

been sold," Williams continued, he demanded "an appraisal of the value of the 1% [of AAC common stock outstanding as of December 31, 1998] and payment of that value as part of the compensation I am still due under the terms of the Agreement."

By letter dated July 27, 2009, Employers denied Williams's request. Williams subsequently sued Employers seeking the "full amount of the value of the [AAC] options that were granted to him" in the Agreement. The sole liability theory on which he ultimately relied was that Employers, as AmCOMP, Inc.'s successor, had breached the Agreement by failing either to pay him the value of the AAC options or allowing him to exercise them.[3] Williams further sought attorney's fees as authorized under chapter 38 of the civil practice and remedies code.[4] Employers answered with a general denial and asserted affirmative defenses of limitations and laches.[5]

Employers filed a motion for summary judgment, attaching evidence that included a copy of the Employment Agreement. It relied on both "traditional" and no-evidence grounds that were predicated largely on a construction of the Employment Agreement. In the guise of both a "traditional" ground based on the Employment Agreement and a "no-evidence" ground challenging

---

[3] Williams has not asserted that AmCOMP, Inc. breached section 4, section (d), by failing to grant him the AAC stock options during the Employment Term (a theory that would seem to render his claims vulnerable to Employers's limitations and laches defenses). Instead, his theory is that AmCOMP, Inc., was free to comply with its obligations under section 4, paragraph (d), by granting the AAC stock options at any time during the Employment Term, i.e., prior to termination, and that this obligation was not breached until Employers refused to fulfill that obligation after termination.

[4] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001-.006 (West 2008).

[5] Employers also asserted that Williams's claims were barred by novation based on a 2005 employment agreement that extinguished the prior agreement. Williams has denied signing the 2005 agreement and Employers did not rely on it as a basis for its summary-judgment motion.

the breach element of Williams's contract cause of action, Employers asserted that any rights Williams might have possessed in regard to the "AAC stock Option" provided by the Employment Agreement's section 4, paragraph (d), had been extinguished by other provisions of the agreement upon his resignation in April 2008. Employers also asserted traditional grounds founded on its limitations and laches defenses.[6] Williams filed a response joining issue with Employers's grounds and its underlying constructions of the Employment Agreement. He argued in part that his rights regarding the "AAC stock Option" under section 4, paragraph (d), had survived his resignation and that these rights had renewed with each annual renewal of his Employment Term, such that his claim for breach had not accrued until he gave notice of his resignation in 2008. At a minimum, Williams urged, the Employment Agreement was ambiguous in these respects.

The district court granted Employers's summary-judgment motion in full and without specifying the grounds on which it relied. Accordingly, it rendered judgment that Williams take

---

[6] Williams has suggested that Employers presented laches as a no-evidence ground, which would, of course, be inappropriate. *See* Tex. R. Civ. P. 166a(i) (no-evidence motion may challenge evidence to support "one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial"). We disagree that Employers relied on the no-evidence standard as opposed to traditional summary-judgment standard in regard to this ground. Employers's motion is structured in three sections. The first is a section titled "Traditional Motion for Summary Judgment," in which Employers asserts its limitations ground and its argument that, based on the attached Employment Agreement, Williams's rights under section 4, paragraph (d), had been extinguished upon his resignation. The second section of the motion is titled "No-Evidence Motion for Summary Judgment," and consists of the no-evidence version of Employers's argument that Williams's resignation extinguished his rights under section 4, paragraph (d). Employers's laches ground is presented in the third section of its summary-judgment motion, titled "Plaintiff['s] Claims are Barred by Laches." Within this third section, Employers does not refer explicitly to either summary-judgment standard, but it is in the nature of a traditional motion, relying on Williams's deposition testimony as evidence to establish its entitlement to judgment as a matter of law.

5

nothing on his claims. The district court subsequently overruled a motion for new trial and motion for rehearing filed by Williams. This appeal followed.

## ANALYSIS

Williams presents five issues on appeal challenging the propriety of summary judgment. In his third and fourth issues, Williams brings forward his arguments that his April 2008 resignation did not extinguish his entitlement to the "AAC stock Option" under section 4, paragraph (d), or that the Employment Agreement was at least ambiguous in that regard, such that the evidence raised a fact issue as to breach and precluded summary judgment. In his second and fifth issues, Williams challenges Employers's limitations and laches grounds as a basis for summary judgment. Williams's first issue is a *Malooly*[7] catch–all asserting generally that the district court erred in granting Employers's summary-judgment motion.

Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). We review the district court's summary judgment de novo. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id.*

Under the "traditional" summary-judgment standard, the movant has the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23

---

[7] *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970).

(Tex. 2000) (per curiam). Assuming this burden is met, and only if it is, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact as to the movant's claims or defenses. *See id.* If the non-movant's evidence raises a fact issue, summary judgment is not appropriate. *See id.*

A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the non-movant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003).[8]

When, as here, the district court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 425 (Tex. App.—Austin 2009, no pet.) (citing *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993)).

---

[8] That is, we will affirm a no-evidence summary judgment when (1) there is a complete absence of evidence of a vital fact; (2) we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.* "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

The pivotal questions in this appeal turn on construction of the Employment Agreement. The parties have agreed that Florida law governs this case, including the principles we apply to construe the Employment Agreement. However, both sides have relied in part on Texas contract-construction cases and neither has suggested any material difference between Florida and Texas law on that subject. Accordingly, we will cite to Texas contract-construction principles for convenience.

When we construe a written contract, our primary concern is to ascertain and give effect to the intentions the parties have objectively manifested in that instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam); *see Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("As with any other contract, the parties' intent is governed by what they said, not by what they intended to say but did not."). To that end, we construe the contract in its entirety, considering each part in relation to every other part so that the effect of each part on others may be determined and that no part will be rendered meaningless. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id*. If we can give the contract a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006). If, on the other hand, the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue as to the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Lack of clarity does not create an ambiguity and "[n]ot every difference in the interpretation of a contract . . . amounts to an ambiguity." *Universal Health*

8

*Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).

We will begin our analysis with Williams's third and fourth issues, relating to whether his rights regarding the "AAC stock Option" under section 4, paragraph (d), survived his resignation. As a threshold matter, the parties have advanced divergent and sometimes equivocal or inconsistent views regarding the nature of the right conferred to Williams under this provision. On appeal, Williams argues that section 4, paragraph (d), is a promise of a grant of an option to purchase AAC stock that was left unperformed by AmCOMP, Inc. and its successor, Employers. Employers, in contrast, argues that section 4, paragraph (d), in itself effected a grant of AAC stock options to Williams, and the problem is that Williams failed to exercise them timely. In the posture of this appeal, we must assume that Williams's view is the correct one.

The right conveyed by section 4, paragraph (d), is phrased in terms of a promise to grant stock options in the future—"shall grant"—as opposed to terminology reflecting a present or self-effectuating grant (e.g., "is granted," "hereby grants," etc.). Read together with the other paragraphs within section 4, paragraph (d) contemplates that AmCOMP, Inc. "shall grant" the AAC options as prescribed during the "Employment Term," as part of Williams's "compensation." Moreover, while Employers urges that section 4, paragraph (d), contains all necessary material terms—including the quantity of AAC shares provided (1% of AAC common stock outstanding as of December 31, 1998), the expiration date (the end of the Employment Term), and the means of calculating the strike price—the provision, as Williams notes, does not specify when or how the option can be exercised, when and in what form payment for the AAC stock must be made, or to whom the payment must be made—AAC, AmComp, Inc., or some other entity. And, as Williams

9

further points out, the Florida Business Corporation Act appears to require greater specificity in an option grant, as well as board approval of stock options provided by Florida corporations such as AAC:

> Unless the articles of incorporation provide otherwise, a corporation may issue rights, options, or warrants for the purchase of shares of the corporation. The board of directors shall determine the terms upon which the rights, options, or warrants are issued, their form and content, and the consideration for which the shares are to be issued.

§ 607.0624, Fla. Stat. Nothing in the Employment Agreement or the record before us indicates that the AAC board of directors took any action with regard to the AAC stock options contemplated by section 4, paragraph (d), much less the nature of any "terms upon which [they] are issued, [or] their forms and content."

We conclude that this record, at a minimum, raises a fact issue as to whether the AAC stock options contemplated by section 4, paragraph (d), were ever granted to Williams, such that summary judgment predicated on this legal conclusion would have been inappropriate. Consequently, the summary judgment must rest upon the alternative view of the right advocated by Williams—that section 4, paragraph (d), is a promised grant of AAC stock options that was left unfulfilled by AmCOMP, Inc., and Employers. However, even accepting Williams's view as to the nature of this right, the right was unambiguously extinguished upon his resignation by other provisions of the Employment Agreement.

As previously observed, AmCOMP, Inc.'s obligations to provide Williams "compensation" under section 4 (including the "AAC stock Option") and "other benefits" under section 5 applied "during the Employment Term." Consequently, these obligations did not continue

10

accruing beyond the April 2008 termination of the Employment Agreement. However, neither section 4 nor section 5 address whether AmCOMP, Inc. would remain liable post-termination for any "compensation" or "other benefits" that had already accrued or became owing to Williams prior to termination and were not yet paid. In the posture of this appeal, again, we must assume that the right conveyed to Williams under section 4, paragraph (d), was in the nature of an accrued obligation of compensation to Williams that AmCOMP, Inc., would have still owed, all other things being equal,[9] upon the date of termination.

However, in its summary-judgment motion and on appeal, Employers has emphasized that section 7, paragraph (b), of the Employment Agreement regulates its post-termination liability for accrued compensation and "other benefits" owed to Williams and, it urges, would serve to extinguish any liability it had for the AAC stock options promised under section 4, paragraph (d). Section 7 specifically governs the parties' respective rights upon termination of the Employment Agreement, and paragraph (b) provides, in relevant part:

> Notwithstanding anything to the contrary expressed or implied herein, . . . [AmCOMP, Inc.] (and its affiliates) shall not be obligated to make any payments to [Williams] or on his behalf of whatever kind or nature by reason of the termination of the Employment Term by . . . [Williams] . . . other than:
>
> (x) such amounts, if any, of his Salary and Underwriting Compensation as shall have accrued and remain unpaid as of the date of said termination and
>
> (y) such other amounts, if any, that may be then otherwise payable to [Williams] pursuant to the terms of [AmCOMP, Inc.'s] benefits plans or pursuant to Section 5(f) above.

---

[9] I.e., leaving aside other provisions of the Employment Agreement and Employers's limitations and laches defenses.

11

(Formatting added for clarity). The effect of this provision is to shut off, "[n]otwithstanding anything to the contrary expressed or implied" elsewhere in the Employment Agreement, the post-termination liability of AmCOMP, Inc. (and, thus, Employers, its successor), for "any payments to [Williams] . . . of whatever kind or nature." The sole exceptions to this limitation are the two categories of "payable" or "unpaid" amounts enumerated in subparagraphs (x) and (y), for which AmCOMP, Inc. (and thus Employers) remained liable.

The parties join issue as to the breadth of the phrase "any payments to [Williams] . . . of whatever kind or nature" and whether the AAC stock options contemplated by section 4, paragraph (d), would fall within that limitation. Employers has urged that "payments . . . of whatever kind or nature" unambiguously encompasses all of the "compensation" AmCOMP, Inc. agreed to provide under section 4, including the AAC stock options under paragraph (d), as well as the "other benefits" promised under section 5. Consequently, it reasons that section 7, paragraph (b), restricts any liability it might otherwise have had for the AAC stock options contemplated by section 4, paragraph (d). By contrast, Williams reasons that "payments . . . of whatever kind or nature" actually excludes the AAC stock options promised by section 4, paragraph (d), or is at least ambiguous in that regard. He emphasizes that section 4, paragraph (d), refers to a "grant" of the AAC stock Option—"[AmCOMP, Inc.] shall *grant* to [Williams] an option . . ."—as opposed to a "payment" or obligation to "pay." This phraseology, Williams adds, likewise distinguished the conveyance of the AAC stock options from the other forms of "compensation" addressed within section 4, all of which refer to obligations to "pay": "[AmCOMP, Inc.] shall *pay* [Williams] a base salary" (paragraph (a)), "[AmCOMP, Inc.] shall *pay* [Williams] . . . incentive compensation and bonuses" (paragraph (b)), and "[AmCOMP, Inc.] shall *pay* to [Williams] annually

12

as additional compensation (the 'Underwriting Compensation')" (paragraph (c). (Emphases added). Williams likewise suggests that the grant of a stock option is not in the nature of a "payment" owed to him because exercising it would entail his *making* a "payment" to purchase the stock. Thus, Williams concludes, section 7, paragraph (b), does not address and has no application to his rights to AAC stock options under section 4, paragraph (d), or at most creates an ambiguity as to its impact on those rights.

We are persuaded by Employers's view that "payments . . . of whatever kind or nature" in section 7, paragraph (b), unambiguously encompasses the promised "grant" of AAC stock options under section 4, paragraph (d). As an initial observation, the drafters' use of the modifier "payments . . . *of whatever kind or nature*" in section 7, paragraph (b), belies intent that the limitation of AmCOMP, Inc.'s post-termination liabilities apply only to a narrow or overly technical definition of "payments" that might be owed. Relatedly, we observe that a grant of stock options can, at least in informal or colloquial usage, be considered a type of "payment" of employee compensation, akin to the forms of "compensation" that AmCOMP, Inc. obligated itself to "pay" Williams in so many words.[10] But more importantly, subparagraph (y) of section 7 manifests the drafters' intent and understanding that "payments . . . of whatever kind or nature" encompasses grants of stock options.

---

[10] *See, e.g.*, *Miga v. Jensen*, 96 S.W.3d 207, 218 (Tex. 2003) (O'Neill, J., dissenting) (observing that "[o]ver the past decade, stock options have become an increasingly common form of executive compensation. They are often conferred in lieu of more traditional compensation, like salary or cash bonuses to reward outstanding performance and provide an incentive for hard work to increase the company's, and therefore the option's worth."); *Elder v. Islam*, 869 So.2d 600, 601 (Fla. 5th DCA 2004) (stock options constituted "wages" within meaning of prevailing party attorney's fees statute); *see also* Black's Law Dictionary 1554 (9th ed. 2009) ("[s]uch an option is [usually] granted as a form of compensation").

Subparagraph (y), again, is an exception to the general limitation on Employers's post-termination liabilities that makes it liable for "such other amounts, if any, that may be then otherwise payable to [Williams] pursuant to the terms of [AmCOMP, Inc.'s] benefits plans or pursuant to Section 5(f) above." "[A]mounts . . then otherwise payable . . . pursuant to Section 5(f)" refers to the paragraph within section 5 that entitles Williams to reimbursement for out-of-pocket business expenses, and the parties agree that it has no application here. "[A]mounts . . . then otherwise payable . . . *pursuant to the terms of [AmCOMP, Inc.'s] benefits plans*" refers to "benefits" provided under "plans" contemplated within other paragraphs within section 5. These "other benefits" include "employee fringe benefits and pension and/or profit sharing plans," "medical or health plans," and—importantly—"awards of stock options under any stock option plan that may be established by [AmCOMP, Inc.]" in its board's discretion.

Read together, section 5 and section 7, paragraph (b), manifest the drafters' intent that AmCOMP, Inc. would remain liable to Williams post-termination for any AmCOMP, Inc. stock options awards that he was due under any "stock option plan" the company had instituted. More importantly, they reflect the drafters' intent and understanding that such "awards" or "grants" of AmCOMP, Inc. stock that Williams was owed would be "then otherwise *payable*" within the meaning of subparagraph (y). Likewise, such stock options that are "otherwise payable" under (y) would necessarily come within "payments to [Williams] or on his behalf of whatever kind or nature"—paragraph (b)'s general liability limitation—because the former is an exception to the latter. Read together, these provisions confirm the drafters' intent and understanding that grants or awards of stock options, such as contemplated by section 4, paragraph (d), or section 5, would be

a type of "payment[s]" owed to Williams "of whatever kind or nature," and thus subject to the limitation of post-termination liability in section 7, paragraph (b).

Nor do the AAC stock options under section 4, paragraph (d), come within either exception to section 7, paragraph (b)'s liability limitation. Williams acknowledges that the AAC stock options are not among the accrued and unpaid "Salary" or "Underwriting Compensation" that would come within the exception of subparagraph (x). "Salary" and "Underwriting Compensation," as previously explained, are forms of "compensation" distinct from the AAC stock options and are addressed in different paragraphs within section 4. As for subparagraph (y), Williams suggests that if the AmCOMP, Inc. stock options contemplated under section 5 come within subparagraph (y)'s "such other amounts . . . then otherwise payable pursuant to the terms of [AmCOMP, Inc.'s] benefits plans," then the AAC stock option provided in section 4 would likewise be "payable pursuant to the terms of [AmCOMP, Inc.'s] benefit plans." This argument overlooks textual differences between the provisions addressing the AAC stock options in section 4 and the AmCOMP, Inc. stock options in section 5. Namely, only section 5 refers to a grant or award of stock options pursuant to a "plan," and only the section 5 award is termed a "benefit" as opposed to "compensation." Consequently, we agree with Employers that section 7, paragraph (b), unambiguously extinguished Williams's rights to AAC stock options under section 4, paragraph (d), when the Employment Agreement terminated upon the effective date of his resignation.

Finally, in addition to relying on his contrary construction of section 7, paragraph (b), Williams emphasizes section 17 of the Employment Agreement, entitled "Survival of Provisions," but this provision ultimately does not aid him. Section 17 states:

15

> Neither the termination of this Agreement, nor of [William's] employment hereunder, shall terminate or affect in any manner any provision of this Agreement that is intended by its terms to survive such termination, including without limitation, the provisions of Sections 4 to 7 inclusive and Section 9 hereof.

Section 17 contemplates that the parties' rights and duties under the Employment Agreement are extinguished upon the Agreement's termination except to the extent that a particular provision "is intended by its terms to survive such termination." It cites as non-exclusive examples of provisions "intended by [their] terms to survive such termination" those of "Sections 4 to 7 inclusive and Section 9." As previously noted, section 4 of the Employment Agreement is the section addressing Williams's "compensation"—including paragraph (d), the provision addressing the AAC stock options—while section 5 addresses the "other benefits" provided to Williams during his Employment Term. As for the other provisions that section 17 mentions specifically, sections 6 and 9 consist of, respectively, a confidentiality and a non-compete provision, while section 7, as noted, addresses the means by which the Employment Agreement can be terminated and the parties' respective rights in that event.

Although section 17 references "the provisions of Section 4 to 7 inclusive" as examples of "any provision of this Agreement that is intended by its terms to survive such termination," this plainly does not mean that every provision within section 4, 5, 6, or 7 is *ipso facto* "intended by its terms to survive such termination," such that the entirety of the obligations stated under these sections would survive. For example, AmCOMP, Inc.'s promises of "compensation" under section 4 and "other benefits" under section 5 are explicitly intended *not* to extend beyond termination—i.e., the company didn't commit to keep paying Williams his "compensation" and "other benefits" even after he left employment—because each set of promises is made applicable

16

only "during the Employment Term," which by definition ended upon the Employment Agreement's termination. In contrast, section 6's confidentiality provisions, section 9's non-competition clause, and section 7's provision addressing the parties' rights upon termination are each made applicable by their terms beyond termination to some degree. And section 7, as we have explained, operates after termination and explicitly limits AmCOMP, Inc.'s liability for compensation and benefits that had been owing prior to termination.

Consequently, section 17's reference to "the provisions of Sections 4 to 7 inclusive and Section 9 hereof" as examples of provisions "intended by [their] terms to survive such termination" means only that these sections contain one or more provisions that is "intended by its terms to survive such termination," not that every single provision within those sections necessarily will be. In other words, section 17 does not in itself answer whether section 4, paragraph (d), is "intended by its terms to survive such termination," but merely begs the question whether it is. The answer to that question, again, is provided in section 7, paragraph (b), which extinguishes AmCOMP, Inc.'s (and Employers's) liability for the options "[n]otwithstanding anything to the contrary expressed or implied herein." But even apart from the liability limitation in section 7, paragraph (b), nothing in section 4, paragraph (d), is "intended by its terms to survive such termination," but it is simply silent on that issue. Consequently, section 17 does not aid Williams and, if anything, independently evidences the parties' intent that liability for the AAC stock options end upon termination of the Employment Agreement.

In sum, Employers established as a matter of law that any obligation it owed to Williams regarding the AAC stock options contemplated by section 4, paragraph (d), of the Employment Agreement—the contractual right made the basis of Williams's claims—was

17

extinguished in April 2008, and Williams has not alleged any breach of that obligation prior to termination. We overrule Williams's third and fourth issues. Because our holding establishes the validity of a ground that could independently support summary judgment, we need not address Williams's remaining issues, which address other grounds. *See* Tex. R. App. P. 47.1; *Beck*, 284 S.W.3d at 425.

## CONCLUSION

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Henson;
    Justice Henson Not Participating

Affirmed

Filed:  March 15, 2013

18